**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SANDRA WHITLEDGE,

      Plaintiff,

v.                                   Case No. 18-11444

CITY OF DEARBORN and
JUSTIN SMITH,

      Defendants.
_____/

**OPINION AND ORDER DENYING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT IN PART AND GRANTING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Sandra Whitledge alleges that Defendant Justin Smith, a police officer employed by Defendant City of Dearborn (the "City"), conducted an illegal traffic stop. She also alleges that Smith reached into her car and groped her breast during the stop. Based on these allegations, Plaintiff brings claims under the Fourth and Fourteenth Amendments and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA") against Smith and a municipal liability claim against the City. Plaintiff now moves for partial summary judgment on her Fourth Amendment claims. Defendants filed a joint motion for summary judgment on all claims. These motions have been fully briefed, and the court held argument on these motions on August 28, 2019. For the reasons stated below, the court will deny Plaintiff's motion and will grant Defendants' motion in part as to the Fourteenth Amendment claim and municipal liability claims.

## II. BACKGROUND

Plaintiff and Defendant Smith met while Plaintiff was working as a waitress at her family's deli, which was frequented by Smith and other Dearborn police officers. (ECF No. 40-2, PageID 311.) Plaintiff and Smith were admittedly friendly with each other; however, the exact nature of their relationship is contested. Plaintiff frames their friendship as a relationship necessary for the sake of her job. She knew that the deli's profitability would be hurt without the patronage of Dearborn officers, and she asserts that she played along with the sexual banter of Smith and other officers to help ensure their continued business and good tips. (ECF No. 40, PageID 281.) Plaintiff admits to having a close friendship with Smith, but she alleges that Smith's comments and actions crossed the line on several occasions. (ECF No. 53, PageID 1536–37.)

One of these occasions occurred when Smith texted Plaintiff and asked her if she would have sex with him for his birthday. (ECF No. 40-12, PageID 511, ECF No. 40-6, PageID 424.) On another occasion when Plaintiff was working, Smith leaned over and whispered a sexual comment to Plaintiff while she rang out his food order. (ECF No. 40-2, PageID 318.) Plaintiff also alleges that Smith subjected her to unwanted physical contact at the deli on two separate instances. The first of these instances occurred in January 2012. Plaintiff alleges Smith told her that a lightbulb in the men's restroom was flickering. She alleges that when she went to the restroom to investigate, Smith followed her in, rubbed his groin against her, and tried to kiss her. (ECF No. 40-2, PageID 312.) The second instance occurred around January 2016. Plaintiff alleges that when Smith came to pick up his food, he walked behind the counter of the deli to the area where

Plaintiff was preparing his food and stood close enough to Plaintiff that she could feel his groin pressed against her side. (ECF No. 40-2, PageID 317–18.)

Plaintiff claims that she told several coworkers about these incidents as well as Dearborn police officers Chris Urbanik, Don Edwards, and Marv Sanders. (ECF No. 40-2, PageID 312.) Officer Urbanik confirmed that Plaintiff informed him and Officer Edwards about both incidents in which Smith pushed his groin against Plaintiff. (ECF No. 40-13, PageID 517.) Urbanik also testified that he offered to report these incidents to his superiors or arrange for Plaintiff to speak with a female officer, but that Plaintiff asked him not to because her boyfriend, Brian McCoy, who is also a Dearborn police officer, was already reporting the incident. (*Id.* at PageID 518; ECF No. 41-4, PageID 690–91.)

Defendant admits to sending sexually explicit texts to Plaintiff but denies the incidents of physical contact. (ECF No. 46-6, PageID 424.) According to Smith, he and Plaintiff were "best friends" and would routinely discuss sexual matters and text each other outside of work. (ECF No. 46, PageID 1045.)

On May 2, 2016, Smith stopped Plaintiff for an alleged traffic violation. Smith claims that he observed Plaintiff using her cellphone and stopped her for distracted driving. (ECF No. 46, PageID 1048.) Plaintiff asserts that Smith had no basis for the stop and claims that her phone was in her purse on the passenger seat. (ECF No. 40, PageID 284.) It is undisputed that after Smith pulled Plaintiff over, he switched off the sound recording on his dash camera—an action prohibited by City policy—and approached Plaintiff's car. (*Id.* at 1049.) Plaintiff alleges that when Smith approached her vehicle, he called her "baby girl" and told her that she needed to "check her

surroundings." She further alleges that Smith reached his arm into her car and groped her left breast. (ECF No. 40, PageID 284–85.) Smith left without issuing a ticket to Plaintiff and without running a search of her license plate. (*Id.* at 284.) Smith admits that he reached into Plaintiff's car but claims that he briefly touched Plaintiff on her shoulder. (ECF No. 46, PageID 1049.) He denies touching her breast.

According to Plaintiff, she tried to brush off the stop as a joke, similar to how she handled Smith's inappropriate behavior in the past. (ECF No. 40, PageID 285.) She and Smith exchanged text messages joking about the stop later that night. (ECF No. 40-2, PageID 322.) Plaintiff also told her boyfriend McCoy about the stop later that night, and McCoy insisted on filing a report with his superior officers at the Dearborn Police Department. (ECF No. 40-2, PageID 322–23.)

McCoy reported the stop in May 2016. Thereafter, the Dearborn Police Department began an internal investigation against Smith. (*Id.* at 324; ECF No. 46, PageID 1051.) At the conclusion of this investigation, Smith was found to have violated two departmental polices, the first requiring officers to use audio-visual recordings for the duration of a stop and the second requiring officers conducting non-emergency, self-initiated stops to report their status to dispatch. (ECF No. 46, PageID 1056–57; ECF No. 46-17, PageID 1284.) Smith received a formal written reprimand and a 30-day suspension for these violations. (ECF No. 46-17, PageID 1284.) The case was then referred for additional, criminal investigation to the Wayne County Prosecutors Office.

The Wayne County Prosecutor elected to pursue two charges against Smith: one count of criminal sexual conduct and one count of misconduct in office based on the

traffic stop. A bench trial was held on January 10, 2018, and the judge found Smith not guilty on both charges. (ECF No. 46-18, PageID 1294.) Plaintiff then filed this case.

### III. STANDARD

Summary judgment is appropriate when there exists no dispute of material fact and the moving party demonstrates entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court considers all evidence, and all reasonable inferences flowing therefrom, in the light most favorable to the nonmoving party. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). The court may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment, only the finder of fact can make such determinations. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

The movant has the initial burden of showing—pointing out—the absence of a genuine dispute as to any material fact; i.e., "an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The burden then shifts to the nonmoving party to set forth enough admissible evidence to raise a genuine issue of material fact for trial. *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248; *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017). Not all factual disputes are material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim "and

would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013).

## IV. DISCUSSION

### A. Fourth Amendment Claims

Both Plaintiff and Defendants move for summary judgment on the Fourth Amendment claims. Plaintiff alleges two separate Fourth Amendment claims in Count I. First, she alleges that Smith stopped her without probable cause, and second, that Smith used excessive force when he reached into her car and groped her breast. In response, Smith argues that he is entitled to qualified immunity because he had probable cause to make the stop. Additionally, although he denies Plaintiff's allegations that he groped her breast, he argues that he is entitled to qualified immunity because being free from sexual assault is not a clearly established right under the Fourth Amendment. (ECF No. 46, PageID 1063–64.)

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In analyzing a party's entitlement to qualified immunity, the Supreme Court has noted: "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Several years later, the Supreme Court further honed its qualified immunity

analysis, providing that "judges . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 1. *Unreasonable Seizure*

There is no dispute that Smith initiated a traffic stop against Plaintiff on May 2, 2016. What is disputed, however, is whether Smith had probable cause to conduct the stop.[1] Smith asserts that he observed Plaintiff using her phone while driving. Plaintiff denies these allegations and claims that her phone was in her purse on the passenger seat while she was driving home. (ECF No. 40, PageID 284.)

The right to be free from unreasonable seizures by law enforcement is clearly established by the Fourth Amendment. *See California v. Hodari D.*, 499 U.S. 621, 624 (1991). "[A]n officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016) (quoting *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)). A traffic stop constitutes a seizure within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

---

[1] Defendants repeatedly state in their filings that Plaintiff has "no evidence" to support her claims apart from "her own . . . testimony." (ECF No. 46, PageID 1063.) While unsworn allegations in a complaint are insufficient to defeat a motion for summary judgment, the sworn deposition or affidavit testimony of a plaintiff is evidence that can be relied on to create a dispute of material fact at the summary judgment stage. *See, e.g., Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010); *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6th Cir. 2006).

Smith would be entitled to qualified immunity if he had probable cause to make the traffic stop, but whether probable cause existed rests on a factual dispute for a jury to resolve. If the jury believes Smith's testimony that he observed Plaintiff apparently "using" her phone, Smith would have probable cause to make the stop and will be entitled to qualified immunity.[2] But if the jury believes Plaintiff's contrary testimony on this point—or, at minimum, is convinced that Plaintiff has *disproved* Smith's explanation (Plaintiff bearing the burden of proof of her allegation of the absence of probable cause)—then Smith conducted an illegal stop and will not be entitled to qualified immunity because he violated Plaintiff's right to be free from unreasonable seizures. *See Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th Cir. 1989) ("In this case . . . the jury becomes the final arbiter of appellant Sharp's claim of immunity, since the legal

---

[2] Both Michigan law and the local ordinances of the City of Dearborn prohibit drivers from using cellphones. In Dearborn, it is unlawful for a driver to:
> [R]ead, manually type, or send a text message on a wireless two-way communication device that is located in the person's hand or in the person's lap, including a wireless telephone used in cellular telephone service or personal communication service, while operating a motor vehicle that is moving on a highway or street in this city.

Dearborn, Mich., Code § 18-172(a) (2017).

Michigan law prohibits the "use" of a cellphone while driving. The Michigan statute defines "use" as:
> (a) Using at least 1 hand to hold a mobile telephone to conduct a voice communication.
> (b) Dialing or answering a mobile telephone by pressing more than a single button.
> (c) Reaching for a mobile telephone in a manner that requires a driver to maneuver so that he or she is no longer in a seated driving position, restrained by a seat belt that is installed as required by 49 CFR 393.93 and adjusted in accordance with the vehicle manufacturer's instructions.

M.L.C. § 257.602(b).

If Smith's testimony that he observed Plaintiff "using" her cellphone is credited, Smith would have probable cause to stop Plaintiff under either provision.

question of immunity is completely dependent upon which view of the facts is accepted by the jury."). This same factual dispute also precludes Plaintiff's motion for partial summary judgment on the illegal stop claim. *See Liberty Lobby*, 477 U.S. at 248.

## 2. *Excessive Force*

Another dispute of material fact exists regarding the degree of force used by Smith during the stop. The constitutional right to be free from the use of excessive force by law enforcement officers flows from the Fourth Amendment "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV; *Graham v. O'Connor*, 490 U.S. 386, 388 (1989). Accordingly, excessive force claims are analyzed under the Fourth Amendment's "reasonableness" standard. *Graham*, 490 U.S. at 395. This standard calls for an objective analysis of the officers' actions, made "in light of the facts and circumstances confronting them," and "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396–97 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)); *see also Scott v. United States*, 436 U.S. 128, 137–39 (1978). The reasonableness standard focuses on the specific moment in time the officer made his decision to use force and the information he had at that time. *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007). It does not consider "whether it was reasonable for the officer 'to create the circumstances'" and "it does not require them to perceive a situation accurately." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 915–16 (6th Cir. 2009)).

Smith first argues that he did not use the force alleged by Plaintiff and that he simply gave her "a tap on the should while reminding her to drive safely." (ECF No. 41,

PageID 590.) His version of events directly contradicts Plaintiff's sworn testimony that Smith intentionally groped her left breast. (ECF No. 53, PageID 1570.) Neither party is entitled to summary judgment because of this factual dispute. *See Kain v. Nesbitt*, 156 F.3d 669, 673 (6th Cir. 1998) ("If plaintiff's version as to the nature and degree of force used is credited . . . a jury question is created as to whether the force used was excessive.").

In the alternative, Smith argues that even if he did "brush" Plaintiff's breast, he would still be entitled to qualified immunity because the right to be free from sexual assault by an officer during a traffic stop is not clearly established. (ECF No. 41, PageID 591.) Smith bases this argument on an erroneous interpretation of *United States v. Lanier*, 33 F.3d 639 (6th Cir. 1995) and the mistaken assumption that a constitutional right is clearly established only if a court so decrees in a factually identical case.

*Lanier* involved the federal criminal prosecution under 18 U.S.C. § 242 of a judge accused of multiple sexual assaults. The defendant also faced a simultaneous civil suit brought under 42 U.S.C. § 1983 for the same conduct. Defendants' arguments in the instant matter, it appears, are drawn from the *criminal Lanier* case.

The issue in the criminal case involved whether a right is "clearly established" for purposes of sustaining a criminal conviction under 18 U.S.C. § 242. The defendant was convicted of violating § 242 based on the jury's finding that sexual assault violated the victims' Fourteenth Amendment substantive due process rights. *United States v. Lanier*, 520 U.S. 259, 261 (1997) (summarizing the procedural history of the case). On appeal, the Sixth Circuit vacated the jury conviction on the basis "that § 242 criminal liability may be imposed only if the constitutional right said to have been violated is first identified in

a decision of this Court, and only when the right has been held to apply in a factual situation 'fundamentally similar' to the one at bar." *Id.* at 263. The Sixth Circuit "regarded these combined requirements as 'substantially higher than the 'clearly established' standard used to judge qualified immunity' in civil cases." *Id.* Defendants' analysis in the instant case appears to rely on the Sixth Circuit's holding that a right is clearly established only if it is specifically recognized by the Court of Appeals. Such argument is misguided because the Supreme Court reversed this holding.

The Supreme Court held that the Sixth Circuit erred in determining that a right is "clearly established" only if the Court previously recognized the right in a factually similar case. *Id.* at 268. The Court explained that the test for determining whether a right is clearly established for purposes of sustaining a § 242 conviction is the same as the standard for determining whether a right is clearly established for purposes of qualified immunity. *Id.* at 270. After the Supreme Court reversed, the case returned to the Sixth Circuit, which affirmed the defendant's original trial conviction. *United States v. Lanier*, 201 F.3d 842, 843 (6th Cir. 2000). The Sixth Circuit did not analyze the substance of the defendant's § 242 challenge because of procedural issues with the case, the details of which are not important here. *Id.* at 845. What is important, however, is that the Sixth Circuit affirmed the defendant's § 242 conviction and, in so doing, recognized that substantive due process rights include the right to be free from sexual assault by state actors. Thus, contrary to Defendants' assertions in the instant case, *Lanier* holds that a constitutional right need not be explicitly recognized to be clearly established *and* that the right to be free from sexual assault is clearly established under the Fourteenth Amendment.

Following *Lanier*, the Supreme Court clarified that whether a right is clearly established for purposes of qualified immunity "is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelze*r, 536 U.S. 730, 739 (2002). "'[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances' and has 'rejected a requirement that previous cases be 'fundamentally similar' to the facts in a case to render qualified immunity inapplicable." *Jackson v. City of Cleveland*, No. 17-3840/3843, 2019 WL 2171462, at *51 (6th Cir. May 20, 2019) (quoting *Hope*, 536 U.S. at 739). Put another way, a constitutional right is clearly established when the unlawfulness of an officer's conduct would be "readily apparent to the officer, notwithstanding the lack of fact-specific case law." *United States v. Morris*, 494 F. App'x 574, 579 (6th Cir. 2012) (quoting *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011)).

Viewing the facts in the light most favorable to Plaintiff, the court can fathom no set of circumstances under which it would be reasonable for an officer conducting a traffic stop to grope the driver's body in the way alleged here. The Sixth Circuit's cases of *Lanier* and *United States v. Morris*, 494 F. App'x 574 (6th Cir. 2012) provide sufficient notice to law enforcement officers that sexual assault of a traffic stop detainee amounts to a constitutional violation.

In *Morris*, the defendant officer stopped a woman for an alleged traffic violation and subsequently raped her. He was criminally prosecuted under 18 U.S.C. § 242 for violating the victim's constitutional rights. *Morris*, 494 F. App'x at 578. One of the

arguments the defendant raised on appeal was that he did not have sufficient notice that sexual assault violated the victim's constitutional rights. *Id.* at 579. The Sixth Circuit rejected this argument and held that despite the absence of factually identical precedent, the defendant had sufficient notice that his conduct violated the victim's substantive due process rights. *Id.* at 580. The court's reasoning on this issue was straightforward: "a reasonable law enforcement officer could hardly be surprised to find himself charged with violating the Constitution for raping a person in his custody." *Id.* The same is true in this case. Despite the lack of factually identical precedent, a reasonable officer conducting a traffic stop would know that sexually assaulting a driver violates the Constitution. Accordingly, the court will deny the motions for summary judgment on the Fourth Amendment Claims.

### B. Fourteenth Amendment Claim

The same sexual assault allegation that underpins Plaintiff's excessive force claim forms the basis for her substantive due process claim. Defendants devote a considerable portion of their brief to arguing that Plaintiff's allegations cannot sustain a Fourteenth Amendment claim because the conduct alleged does not "shock the conscience." (ECF No. 41, PageID 594–62.) Not surprisingly, Plaintiff responds that Smith's conduct *is* conscience-shocking. This dispute, however, need not be resolved by a jury because under the circumstances alleged, Plaintiff cannot pursue both an excessive force and substantive due process claim.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court explained that the Fourth Amendment provides the exclusive remedy for claims for excessive force occurring during a seizure: "we hold that *all* claims that law enforcement officers have

used excessive force— deadly or not— in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* at 395 (emphasis in original); *see also Cornwell v. Dahlberg*, 963 F.2d 912, 915 (6th Cir. 1992) (quoting *Graham*).

Plaintiff was seized when she was pulled over for a traffic violation. *See Brendlin*, 551 U.S. at 255; *Graham*, 490 U.S. 395 n.10 (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968)) (explaining that a seizure occurs "only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'"). Because the use of force at issue occurred during a stop, *Graham* instructs that Plaintiff's claims must be analyzed under the Fourth Amendment, rather than as a substantive due process claim. The Supreme Court later clarified that an excessive force claim could be sustained under the Fourteenth Amendment when brought by a pretrial detainee against jail officers. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015). Thus, without analyzing the qualified immunity argument, the court will grant Defendants' motion for summary judgment on the Fourteenth Amendment claim because Plaintiff's claims must be analyzed under the Fourth Amendment.

### C. Elliot Larsen Claims

Plaintiff also asserts that Smith's alleged conduct violates the Michigan Elliot-Larsen Civil Rights Act ("ELCRA").[3] The ELCRA "recognizes that freedom from

---

[3] Although her complaint asserts ELCRA claims against both Defendant Smith and Defendant City, her response to Defendants' motion for summary judgment solely focuses on ELCRA claims against Smith. Accordingly, Plaintiff has waived any ELCRA claims against the City. *See Scott v. Tennessee*, 878 F.2d 382, 1989 WL 72470, at *2 (6th Cir. 1989) (table decision) ("[I]f a plaintiff fails to respond or to otherwise oppose a

discrimination because of sex is a civil right." *Hamed v. Wayne Cty.*, 803 N.W.2d 237, 243 (Mich. 2011). The ELCRA prohibits the denial of "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status." M.C.L. § 37.2302(a). Additionally, the ELCRA "expressly includes sexual harassment as a prohibited form of sex discrimination.'" *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 917 (Mich. 2000). The ELCRA defines sexual harassment as follows:

> Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>
> (i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.
>
> (ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.
>
> (iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

M.C.L. § 37.2103(i).

---

defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion."); *Humphrey v. U.S. Attorney General's Office*, 279 F. App'x 328, 331 (6th Cir. 2008) ("[W]here, as here, plaintiff has not raised arguments in the district court by virtue of his failure to oppose defendants' motions to dismiss, the arguments have been waived.").

Subsections (i) and (ii) listed above are referred to as *quid pro quo* sexual harassment while subsection (iii) is commonly referred to as hostile environment sexual harassment. *See Chambers*, 614 N.W.2d at 310. The complaint plausibly states a claim under each theory of harassment; however, Plaintiff abandons her hostile environment claim by failing to adequately respond to Defendants' motion for summary judgment.[4] Accordingly, the court analyzes her claim under a theory of *quid pro quo* harassment as described below.

The ELCRA provides a cause of action for sexual harassment committed by state actors in the provision of public services. To state such a claim, a plaintiff must allege:

> (1) that he or she was subjected to any of the types of unwelcome sexual conduct or communication described in the statute and

> (2) that the public service provider or the public service provider's agent made submission to the proscribed conduct a term or condition of obtaining public services or used the plaintiff's submission to or rejection of the proscribed conduct as a factor in a decision affecting his or her receipt of public services.

*Hamed*, 803 N.W.2d at 244.

Defendants argue that Plaintiff's *quid pro quo* claim fails as a matter of law because Plaintiff was not implicitly or explicitly forced to submit to unwanted sexual conduct as a term or condition of obtaining a public service. (ECF No. 41, PageID, 626.)

---

[4] Plaintiff waived any ELCRA claims against Defendant City. *See supra* n.3. Respondeat superior is a required element of a hostile environment claim under the ELCRA. *See Chambers*, 614 N.W.2d at 915. Plaintiff's response brief fails to so much as mention the phrase "respondeat superior" let alone provide any substantive analysis for the liability of the City. Therefore, her single un-waived ELCRA claim is for *quid pro quo* harassment against Smith.

Michigan case law makes clear that a plaintiff need not intentionally bargain for favorable treatment to recover on a claim for sexual harassment in the provision of public services.

Accepting Plaintiff's testimony as true, she alleges she was pulled over for no legitimate reason and then groped by Smith, a uniformed officer in a marked patrol car, before she was released from police custody without a ticket. In *Diamond v. Witherspoon*, 696 N.W.2d 770 (Mich. Ct. App. 2005), the Michigan Court of Appeals held that a very similar set of facts stated a claim for *quid pro quo* sexual harassment. The individual defendant in *Diamond* was a uniformed police officer in a marked car who stopped several women on different occasions for alleged traffic violations. During these stops, the defendant engaged in various forms of sexually coercive conduct before allowing the women to leave without receiving tickets. The jury awarded a multimillion-dollar judgment to the plaintiffs. *Id*. at 773. On appeal, the defendants argued that the officer's conduct did not implicate the ELCRA because the plaintiffs were not "denied" police services or other public accommodations. *Id*. at 778–79. The Court of Appeals rejected this argument and explained that the plaintiffs need not have requested a public service to prove *quid pro quo* harassment under the ELCRA. The public service at issue, the court explained, was the plaintiffs' release from police custody. Once the defendant forced them into police custody, the plaintiffs "were not free to leave the public services environment created when [defendant] stopped and detained each plaintiff." *Id*. at 779. The court further explained that the defendant "used plaintiffs' submission to or rejection of his advances as a factor in his decision . . . to properly terminate the stop." *Id*. at 780. On this basis, the court concluded that the

"plaintiffs' sex and submission to or rejection of sexual advances played the singular role in [defendant's] decision to deny public services to plaintiffs." *Id.* Of particular relevance to the instant case, the court explained that *quid pro quo* sexual harassment does not "require the victim to intend to bargain, or believe that he or she is bargaining, for a certain result when the victim makes the decision to submit to, or reject, the sexual advances." *Id.* Rather, "[a]ll that is required is that [defendant], as a public service provider's agent, used plaintiffs' submission to or rejection of his advances as a factor in his decision to provide or deny public services." *Id.*

Plaintiff's version of the facts is sufficient to pursue a claim for *quid pro quo* sexual harassment against Smith. Like the defendant in *Diamond*, Smith was in uniform and driving a marked patrol car when he stopped Plaintiff for a supposed traffic violation. Smith released Plaintiff from police custody only after subjecting her to his sexual advances and sexually assaulting her.[5] The court in *Diamond* makes clear that Plaintiff need not intentionally bargain for her release from custody to state an ELCRA claim because her submission to Smith's sexual advances was an implied condition of release.

Plaintiff's allegations create a triable issue of fact on the *quid pro quo* harassment claim. A jury must determine whether the conduct forming the basis for this claim

---

[5] The inherently sexual nature of Smith's alleged conduct during the stop distinguishes this matter from the case relied on by Defendants, *Johns v. Oakland Cty.*, No. 15-CV-12924, 2016 WL 4396065 (E.D. Mich. Aug. 18, 2016) (Michelson, J.). *Johns* involved an ECLRA claim brought by a female plaintiff who was strip searched in front of male officers while being processed into jail. The court dismissed the plaintiff's claim because there was nothing "inherently sexual" about the strip search, which was conducted in accordance with standard booking procedures. *Id.* at *10.

actually occurred. Accordingly, the court will deny Defendants' motion for summary judgment.

### D. Monell Liability Claims

Plaintiff asserts that the City is liable for Smith's constitutional violations based on a failure-to-train theory of liability. Specifically, Plaintiff asserts that the City failed to train its officers to report instances of sexual harassment, prevent sexual harassment, and to conduct traffic stops based on probable cause. (ECF No. 53, PageID 1581–83.)

A municipality or other local government unit is liable under 42 U.S.C. § 1983 "for constitutional injuries for which it is responsible." *Morgan v. Fairfield Cty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). This responsibility encompasses "harms caused by direct actions of the municipalities themselves, harms caused by the implementation of municipal policies or customs, and harms caused by employees for whom the municipality has failed to provide adequate training." *Id.* (internal citations omitted). The Sixth Circuit has explained that "a municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights. *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 692). A plaintiff can demonstrate the existence of an "official policy" by alleging either: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4)

the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* at 387 (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

When a plaintiff relies on "the existence of a policy of inadequate training or supervision," as Plaintiff does here, she must show "prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess*, 735 F.3d at 478 (quoting *Miller v. Sanilac Cty.*, 606 F.3d 240, 255 (6th Cir.2010)). Thus, a plaintiff must show that a city was deliberately indifferent to ongoing constitutional violations. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) (explaining that "[a] pattern of similar constitutional  violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference."). A municipality acts with deliberate indifference when it disregards "a known or obvious consequence of [its] action," *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).

Municipal liability claims predicated on some form of inaction on the part of the state actor impose a "heavy burden on the plaintiff" because a plaintiff "cannot rely solely on a single instance to infer a policy of deliberate indifference." *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005). Failure to train cases, the Supreme Court has explained, constitute the "most tenuous" basis for municipal liability. *Connick*, 563 U.S. at 61.

The Sixth Circuit has articulated three elements for a failure to train or supervise claim: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun.*

*Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "Mere allegations that an officer was improperly trained *or that an injury could have been avoided with better training* are insufficient to prove liability." *Miller v. Calhoun Co.*, 408 F.3d 803, 816 (6th Cir. 2005) (emphasis added). Accordingly, failure to train cases requires proof of "[a] pattern of similar constitutional  violations by untrained employees." *Connick*, 563 U.S. at 62. Here, Plaintiff alleges that the City failed to train its officers in several respects. As explained below, the City is entitled to judgment as a matter of law on each of these claims because the facts alleged fall short of constitutional violation.

Plaintiff argues that the City failed to train its officers to conduct proper investigatory stops. This claim fails for several reasons. First, Plaintiff concedes that Smith received training on investigatory stops; however, she argues that additional training was needed. (ECF No. 53, PageID 1584.) As explained above, this argument is insufficient to survive summary judgment. *Miller*, 408 F.3d at 816 ("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability."). Second, the City has a policy requiring officers to have probable cause to make an investigatory stop. This policy also defines the term probable cause. (ECF No. 41-18, PageID 886–88.) The failure of a single officer to follow departmental policy does not demonstrate deliberate indifference on the part of the City. *See Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 542 (6th Cir. 2018) (explaining that "bad judgment" by officers, not a lack of training, led to the violation at issue). Third and finally, Plaintiff fails to provide any evidence of "prior instances of unconstitutional conduct" related to illegal stops. One instance of unconstitutional conduct is insufficient to impose liability on the City. *See Connick*, 563

U.S. at 54 (holding that district attorney could not be held liable under § 1983 "for failure to train based on a single *Brady* violation"); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 574 (6th Cir. 2016) (holding that the plaintiff could not sustain a failure to train claim against the municipality based on one search in which the officers killed the plaintiff's dogs); *Burgess*, 735 F.3d at 478.[6]

Plaintiff also asserts failure to train claims based on the fact that Defendant Smith did not receive specific training on sexual harassment prevention and that the City did not instruct officers on procedures for reporting claims of sexual misconduct made by members of the public against officers. (ECF No. 53, PageID 1584–85.)

With respect to sexual harassment prevention training, the mere absence of a specialized training program is not sufficient to impose liability for the City. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 392 (1989) ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."); *Hanson*, 736 F. App'x at 542 ("The mere existence of a training program or lack thereof is not sufficient. There is no constitutional requirement to 'train'

_____

[6] The Supreme Court has hypothesized that in rare situations, a failure to train § 1983 claim can be sustained without proof of deliberate indifference under what courts have named the "single instance" theory of liability. *See City of Canton v. Harris*, 489 U.S. 378 (1989); *see also Connick*, 563 U.S. at 63 (summarizing *Canton*). The instant case does not constitute one of these rare cases. In *Canton*, Supreme Court described a single instance liability situation in the context of a hypothetical police department that armed its officers with firearms to assist officers in arresting fleeing felons but that failed to provide any guidance on the constitutional limitations of the use of deadly force. *Canton*, 489 U.S. at 390 n.10. The instant case is distinguishable from the type of indiscriminate use of force contemplated in *Canton* because Smith received specific training on how to conduct investigatory stops *and* the City had a written policy describing when officers could initiate stops.

writ large.") (internal citation omitted). Defendants have presented evidence that Dearborn officers received some anti-harassment training. (ECF No. 41, PageID 609.) Plaintiff does not allege that any other officer engaged in similar sexual harassment or that, prior to McCoy reporting the stop to his supervisors, the City was on notice of Smith's misconduct.[7] Plaintiff's allegations simply do not demonstrate that the City had knowledge of any widespread misconduct. *See Connick*, 563 U.S. at 62 (explaining that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference."); *Brown*, 844 F.3d at 574; *Burgess*, 735 F.3d at 478.

Plaintiff bases this claim on the fact that she told other officers about Smith's conduct prior to the stop. As previously explained, one of the officers she spoke with, Officer Urbanik, offered to report Smith's conduct to his superior officers—and even offered to have a female officer speak with Plaintiff—but Plaintiff declined Urbanik's offer. Instead, she insisted that her boyfriend, Corporal Brian McCoy, would report the incident. (ECF No. 40-13, PageID 518.) Plaintiff attempts to analogize this claim to other failure to report cases brought against school boards by students who were sexually abused by their teachers. As explained below, these cases illustrate that far more pervasive conduct is necessary to sustain a failure to report claim than the conduct at issue here.

---

[7] Plaintiff cites text messages sent by other non-defendant officers and alludes to sexual statements made by officers as proof that the City "condoned a demeaning attitude towards women" (ECF No. 53, PageID 1585; ECF No. 53-2, PageID 1610.) However, she offers no evidence that the City knew of this conduct.

Plaintiff relies on two, nonbinding district court cases. The first of which, *Craig v. Lima City Schs. Bd. Of Educ.*, 384 F. Supp. 2d 1136 (N.D. Ohio 2005), involved a plaintiff who was sexually assaulted by a teacher on several occasions. The plaintiff brought a § 1983 claim against the Lima Board of Education based on its purported custom of ignoring the sexual abuse of students by teachers. To support her claim, the plaintiff testified about her own abuse and also offered evidence that other students at her school were abused by school employees and that the school board knew of this abuse but failed to take appropriate action. *Id.* at 1148. The court denied the parties' cross-motions for summary judgment because a material dispute of fact existed as to whether there was "a clear and persistent pattern of sexual abuse by school employees." *Id.* at 1148. The other case cited by Plaintiff, *Belcher v. Robertson Cty.*, No. 3-13-0161, 2014 WL 6686741 (M.D. Tenn. Nov. 26, 2014), involved a school's failure to prevent student-on-student sexual abuse perpetrated by one student against multiple students over a period of years. In contrast, the instant case involves allegations of misconduct by a single officer against one individual. Plaintiff provides no evidence that other officers were engaged in similar misconduct or that Smith targeted multiple women. Under these circumstances, the actions of a single officer fall short of the extensive misconduct necessary to demonstrate deliberate indifference on the part of the City as to the need for additional training. As the Sixth Circuit has explained in the context of another case involving the sexual abuse of students by a teacher:

> [E]ven where a school board had some information that one of its teachers may have sexually abused students in the past and the board failed to remove him before he abused the plaintiff, the school board could not be found liable for having a policy, custom, or practice of condoning such abuse because there was no evidence that the school board failed to act

regarding other teachers in similar circumstances; thus there was no evidence of any deliberate pattern.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005) (summarizing *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

The City had policies in place to report sexual harassment. Officer Urbanik offered to report Smith, even though he did not ultimately do so . . . at Plaintiff's request. Additionally, Corporal McCoy finally made a formal complaint against Smith after the stop, and this formal report spurred an internal investigation, criminal investigation, and criminal prosecution. The City acted once it became aware of the complaints against Smith. Even if the City "could have done" more, *Canton*, 489 U.S. at 392, to address Smith's earlier misconduct, the City cannot be held liable. *See*, *Connick*, 563 U.S. at 62; *Hanson*, 736 F. App'x at 542.

## V. CONCLUSION

The Fourth Amendment governs Plaintiff's claims against Defendant Smith because the unconstitutional conduct alleged occurred during a seizure. Disputes of material fact remain as to whether Smith had probable cause to initiate the stop and the degree of force used by Smith during the stop. The court will deny the cross-motions for summary judgment based on these contested facts. The factual dispute as to the degree of force used by Smith also creates a triable issue as to Plaintiff's ELCRA *quid pro quo* sexual harassment claim. However, viewing the facts in the light most favorable to Plaintiff, her allegations fall short of the type of pervasive conduct necessary to establish municipal liability. Accordingly,

IT IS ORDERED that Plaintiff's Partial Motion for Summary Judgment (ECF No. 40) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment

(ECF No. 41) is GRANTED IN PART. It is GRANTED as to the Fourteenth Amendment

claim (Count II) and municipal liability claim (Count IV). It is DENIED as to the Fourth

Amendment claims (Count I) and claim for *quid pro quo* sexual harassment under the

Elliott Larsen Civil Rights Act (Count III).

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 4, 2019

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, September 4, 2019, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\HEK\Civil\18-11444.WHITLEDGE.summary.judgment.3.HEK.docx